IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL A. MCKAY,

                         Plaintiff,                         OPINION AND ORDER

    v.

                                                                  23-cv-504-wmc

WISCONSIN DEPARTMENT OF REVENUE,
DAVID CASEY[1], PETER BARCA, HOLLY KITTLE,
JENNIFER DAMBACH, and VICTORIA SIMONSON,

                         Defendants.

Plaintiff Michael McKay, a veteran of the United States Marine Corps and former revenue agent with defendant Wisconsin Department of Revenue ("DOR"), brings this lawsuit against his former employer and supervisors under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq.; and the Free Exercise Clause of the First Amendment.  Generally, he claims that DOR's implementation of a return-to-work policy during the COVID-19 pandemic made his working conditions intolerable and forced him to quit.  More specifically, as a non-denominational Christian who suffers from numerous service-related disabilities, McKay asserts claims under:  Title VII for monetary and injunctive relief, as well as the ADA for injunctive relief, against DOR and its Secretary, defendant David Casey, in his official capacity, for failure to offer a reasonable accommodation, alleged religious and disability harassment resulting in a hostile work environment and constructive discharge, and retaliation; and the

---

[1] The court has amended the caption to reflect the appointment of David Casey as Secretary of the Wisconsin Department of Revenue and the appropriate defendant for purposes of injunctive relief. *See* Fed. R. Civ. P. 25(d).

First Amendment Free Exercise Clause against individual defendants Peter Barca, Victoria Simonson, Holly Kittle, and Jennifer Dambach.

Two motions are pending before the court:  (1) defendants' unopposed motion to amend their answer to assert previously-pleaded sovereign immunity defenses on behalf of each of the individual defendants, as well as DOR (dkt. #42), which will be granted; and (2) defendants' motion for summary judgment as to all of plaintiff's claims (dkt. #43).  For the reasons below, defendants' motion for summary judgment will also be granted as to all of plaintiff's claims *except* for his claim that defendants denied him a reasonable accommodation on religious grounds, which will proceed to a jury trial on June 8, 2026, to resolve disputed issues of material fact.

## UNDISPUTED FACTS[2]

### I.    Background

Plaintiff Michael McKay is a veteran of the United States Marine Corps with numerous service-related disabilities, having endured shelling with mortars and artillery and suffered substantial exposure to burn pits, oil fires, and VX gas during his Gulf War deployment from August 1990 to February 1991.  He has been diagnosed with chronic obstructive pulmonary disease ("COPD"), irritable bowel syndrome ("IBS"), chronic fatigue, neck and back issues, tinnitus with some hearing loss in each ear, and chronic, multi-symptom illness

---

[2] Unless otherwise indicated, the following facts are material and undisputed for purposes of summary judgment.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as from the record evidence as appropriate, recounting them in the light most favorable to plaintiff. *McGee v. Parsano*, 55 F.4th 563, 566 (7th Cir. 2022).

(known as "Gulf War syndrome").[3] He also represents that his COPD gives him chest pain and shortness of breath, and his IBS requires that he take frequent bathroom breaks. In addition, his family and he sincerely hold the beliefs of nondenominational Christians, which they practice strictly according to their understanding of its tenets as set forth in the Holy Bible and their biblical interpretation, which they assert are supported by religious leaders throughout the world.

In 2016, McKay was hired as a Revenue Agent for the DOR, working in the Division of Income, Sales and Excise Taxes ("IS&E")[4] at its headquarters in Madison, Wisconsin. He remained in that position until he resigned on February 11, 2022. When he was hired, McKay informed DOR that he was a veteran with less than 30% service-connected disabilities. However, over the years of his employment with DOR, he maintains that his service-connected disability rating became more severe, rising to 100% by September 2021. According to McKay, his job duties included: analyzing tax returns on a secure computer network; talking to taxpayers on the phone; communicating with his supervisors and co-workers through phone and digital means; and only very occasionally, meeting with people in person.[5] His usual office space was a cubicle.

---

[3] While defendants concede these contentions for purposes of summary judgment, they expressly reserve the right to challenge at trial that McKay has the service-related conditions and disabilities claimed because he has yet to provide his certified medical records. (Dkt. #64, ¶ 1.)

[4] IS&E has approximately 825 permanent employees.

[5] Contrary to defendants' response to plaintiff's proposed factual findings (dkt. #64, ¶ 24), McKay identifies his job duties in his declaration (dkt. #59, ¶ 29), which defendants fail to contradict with any admissible evidence.

The individual defendants all worked for DOR while McKay was employed there.  Peter Barca was DOR Secretary from 2019 to 2024; Jennifer Dambach was the Audit Bureau Section Chief for the Individual Income Tax Section of IS&E[6] until November 20, 2022, when she became the Deputy Administrator of IS&E; Victoria Simonson has been Human Resources Specialist-Senior and Medical Coordinator[7] since July 6, 2020; and Holly Kittle as a Revenue Agent Supervisor at DOR and McKay's direct supervisor from November 2020, until McKay resigned in February 2022.

## II.  DOR Accommodation Policies

"DOR Policy Directive 360-4 -- Reasonable Accommodations" states that DOR is responsible for determining the reasonableness of a disability or religious accommodation, considering the following relevant factors:

- Are the job functions for which the accommodation is requested essential to the overall performance of the job?

- Is the applicant or employee otherwise qualified to perform the essential job functions?

- Will the accommodation accomplish the desired result (i.e., will it allow an individual to adequately perform the job)?

- Will the accommodation adversely affect the productivity or safety of employees and the general public, or the work environment of other employees in the work unit?

- Is the cost of the accommodation feasible within the Department budget?

---

[6] In this position, Dambach managed approximately 100 individual income tax auditors, agents, tax representatives, and their supervisors, including McKay and his direct supervisor, defendant Kittle.

[7] Specifically, Simonson works for Region 4 of the Department of Administration ("DOA") Division of Personnel Management ("DPM"), which provides centralized and decentralized human resources leadership for State agencies, including DOR.

- Are there other, more cost-effective options that will allow the individual to adequately perform the job?

(Dkt. #44-2, at 5.)  The policy further states that the accommodation "need not be the same as the employee requested, as long as it is effective in addressing the documented medical need."  (*Id*. at 4.)

DPM also maintains a webpage (https://dpm.wi.gov/Pages/Reasonable-Accomm-odations.aspx), which informs employees about the meaning of reasonable accommodation, the process for obtaining one, and the responsibilities of employees and supervisors during that process.  Finally, Region 4 has its own reasonable accommodation page on its intranet, where employees can complete an accommodation request using the DOA-15104, "Reasonable Accommodation Request Form," which states that (i) the process is interactive and (ii) the employer may request additional information from the treating medical professional or religious leader.

While the Policy Directive instructs employees to refer accommodation requests to the Diversity Officer, DPM used additional staff to review them.  Specifically, reasonable accommodation requests for DOR employees were processed by defendant Simonson in 2021.  At that time, if a Region 4 employee initially brought their accommodation request to their supervisor, the supervisor was directed to send the information to Simonson.

If an accommodation is *granted*, then the employee is responsible for notifying his or her supervisor of the accommodation, including upon moving to new offices or a different job.  In particular, Simonson is not even informed when employees move to a different office location or different job.  Moreover, the DOR Policy Directive states that any modifications to an existing accommodation should be requested following the same procedures.  Finally, if an

5

accommodation is *denied*, the employee has 30 calendar days to appeal that decision to DOR's Diversity Officer, who in turn presents the appeal to the Department Secretary, who must issue a final decision regarding the appeal in writing, within 30 calendar days after the appeal was filed.

### III. DOR's COVID-19 Protocols

According to Wendy Copus, the HR Director for Region 4, the COVID-19 pandemic required continuously changing responses to the illness, the hazards it posed to employees in the workplace, and the legal obligations of employers.  As a state agency, DOR followed the COVID-19 safety protocols issued by DOA.

#### A.  Work From Home

Initially, all DOR employees were instructed to work from home from March 2020 to July 4, 2021, and were provided with the equipment to do so.  By June 1, 2021, about half of the DOR staff had returned to the office. At that time, about 35% of all IS&E employees had less than five years of state experience, and another 36% had five to 10 years of state experience, so IS&E set a goal of having 50% of its workers in the office from 7:45 a.m. to 4:30 p.m. every day.  Then, DOR instructed employees to return to the office as a part of the State's resumption of normal operations on July 5, 2021.

According to Section Chief Dambach, about half of DOR employees still telecommute by working part-time from home, and some number under her supervisory authority work 100% of the time from home based on a medical accommodation.  However, Dambach maintains that it is important for DOR employees to understand that a telecommuting policy is different than the COVID-19 work-from-home policy, which arose out of the emergency

situation caused by the pandemic to keep employees safe.  More specifically, the ability to telecommute is: discretionary on the part of management; not an employee benefit or right; and not a change of the terms and conditions of employment with the State.  Indeed, Secretary Barca explained in updates to staff that the agency never intended to move to telecommuting full-time, except during the COVID-19 emergency.

### B.  Masking Requirement

Because the Delta variant of the virus was very transmissible when employees were returning to the office in July 2021, the State also issued "Updated COVID-19 State Agency Guidance," which required all employees to mask in state facilities, effective August 5, 2021. Secretary Barca notified all DOR staff about this new masking requirement via email on August 4, 2021, and Supervisor Kittle in turn emailed her unit staff on August 11, reminding them to always wear their masks in the office.  However, McKay and a few other employees objected to masking.  For example, on or around August 20, Section Chief Dambach observed McKay not wearing a mask, and when she told him to put his mask on, McKay openly defied her.  Like every other employee who expressed disapproval of the guidelines, Dambach referred McKay to the State's guidance for questions and to comply with the directives, which were designed to keep employees and the visiting public safe.

After Secretary Barca emailed DOR staff on August 23, 2021, to remind them again about the masking requirement, Section Chief Dambach held a section wide meeting on August 27, to discuss the importance of complying with the State's directives regarding masking, an upcoming testing requirement, and sharing vaccination status information.  During that meeting, IS&E Division Administrator Diane Hardt also reviewed the new requirements and the consequences of failing to comply with them.  Still, McKay and a few other employees

7

expressed frustration about the State's vaccine and masking requirements during the meeting. The same day, Supervisor Kittle emailed her unit staff specific updates, reminded them to wear their masks properly, and instructed them to contact HR if they had a medical concern for which a reasonable accommodation was needed.

On August 29, 2021, Administrator Hardt next emailed all DOR Bureau Directors and Section Chiefs about the masking requirement, instructing them to: (1) enforce the masking requirement as a department directive; (2) consult HR if employees were unwilling to comply; and (3) remember that numerous employees had reported concerns about their unmasked coworkers potentially transmitting the virus to them and their vulnerable family members. Therefore, on August 31, 2021, Supervisor Kittle emailed her staff to remind them of the requirement to wear a mask properly when working unless they had an advance approved medical accommodation not to do so.

### C. Reasonable Accommodation Process During and After Pandemic

#### 1. Work From Home Requests

After employees were instructed to return to the office, HR Director Copus reminded HR staff that in reviewing accommodation requests to continue to work 100% from home, they should consider whether such an accommodation would result in an undue burden on DOR. In addition, while an employee's accommodation request was being processed, Copus advised that employees should be directed to continue working under their current conditions in the office and to follow all DOR work rules. According to Section Chief Dambach, in-person collaboration is important to employee development, especially in transferring knowledge to newer employees, *and* in-office work helps protect private taxpayer and employee information, as well as other confidential information. Still, Dambach agrees that DOR had been able to

maintain both its productivity level and confidentiality while staff was working from home during the pandemic.  In fact, one employee on McKay's floor, Jill Sorg, *was* permitted to continue to work from home full-time because of either her or a family member's health issue.

### 2.  Religious Accommodations

During the pandemic, HR Director Copus and HR Specialist Simonson, as well as Angela Zilliox, the Diversity Officer for Region 4 and Simonson's direct supervisor, discussed their concerns that employees may be seeking religious accommodation letters unrelated to their own sincerely-held religious beliefs in order to be exempted from COVID-19 masking and testing policies.  According to Simonson, it was determined that if she could easily locate a copy of the employee's letter online, the religious accommodation request would be denied. (*See* Simonson dep., dkt. #55, at 51-52.)   Nonetheless, Director Copus claims that she reminded HR staff to analyze all religious accommodation requests related to COVID-19 policies individually under DOR's standard procedures,[8] while also applying the additional considerations that DOR implemented for such requests:  (1) whether the religion that the individual practiced provided information on why masking was not allowed; (2) the length of time that the employee had been a member of the religious body or sect, with documentation of membership; (3) documentation of the religious doctrine preventing the wearing of a mask in the workplace or submitting to COVID testing (i.e., documentation could not be a template found on the internet); and (4) a statement by the employee outlining his or her sincere belief that wearing a mask or submitting to a test violates the employee's sincerely held religious beliefs.  Therefore, standardized forms or templates filed in support of an employee's religious

---

[8] The parties dispute whether DOR actually followed these procedures or conducted an individualized assessment in McKay's case in particular.

accommodation request were not accepted so as to ensure that each request was related to the employee's *personal* religious practices and beliefs, rather than submitted simply because the employee did not want to wear a mask.

## IV. McKay's Accommodation Requests

Like all other DOR employees, McKay worked full-time from home from March 2020 to July 2021, then returned to work part-time in the office. McKay claims that: he could readily collaborate via video using "Teams" software while working from home; and using DOR measurements of tasks accomplished, his productivity remained equal to or greater than that of his in-office work. Indeed, when McKay was seeking to change positions within state employment in early August 2021, his direct supervisor, Kittle, wrote him a glowing letter of recommendation dated August 13, 2021. After the masking requirement took effect in August 2021, McKay sought a reasonable accommodation on both disability and religious grounds, asking to work in the office without a mask or, alternatively, to work 100% from home.

### A. Disability Grounds

On August 30, 2021, McKay emailed a reasonable accommodation form to his direct supervisor, Kittle, claiming that he could not wear a mask for medical reasons. Specifically, McKay's request form stated that he had been diagnosed with Grade II COPD and could not breathe adequately with a mask, becoming light-headed and sick to his stomach even walking between his desk and the printer, and suffering from headaches and blurred vision with prolonged masking. While McKay's form included no medical support for his request, he emailed Kittle the next day that he had requested medical documentation from his doctor and would be in the office the following morning but was "unable to comply" with the masking

requirement.  (Dkt. #45-7, at 2.)  Based on this response, Kittle assumed that McKay would not be wearing a mask at work the following day, so she contacted Employment Relations ("ER") Specialist Alenka Dries for guidance.

On September 1, 2021, Kittle forwarded McKay's disability accommodation request to HR Specialist Simonson, who emailed McKay directly to ask that his medical provider provide a letter or complete DPM's medical accommodation request form, which was attached to the email.  While awaiting McKay's medical documentation, Simonson told ER Specialist Dries on September 2, that employees like McKay who were requesting an accommodation to the masking requirement were *not* allowed to work from home while the request was being processed.  Dries passed this information along to Supervisor Kittle, who immediately informed McKay that he was expected to return to the office and comply with the mask mandate until an approved reasonable accommodation was in place.  Although HR had informed Kittle that working from home was not an option while an accommodation was pending, she received approval from her supervisors to allow McKay to adjust his normal Thursday telecommute day to allow him to work from home on Friday, September 3 and Tuesday, September 7, in order to give him additional time to submit his supporting medical documentation.  In response, McKay emailed Simonson and Kittle on September 2, 2021, stating that: (1) he had requested a letter from his doctor, who might not be able to provide it until later that day or the following day; and (2) he would need to return to work unmasked or be allowed to work from home until his accommodation was approved.  Kittle told McKay on September 3, that if he returned to the office on Wednesday, September 8, without complying with the DOR masking mandate or providing an approved accommodation, then she would pursue disciplinary action.

On September 8, 2021, McKay submitted a medical document from the Veteran's Administration and a short letter from Nurse Practitioner Erika Bourdeaux, who noted McKay's COPD and chronic fatigue diagnoses, as well as stated her "professional opinion that [McKay should] be EXEMPT from wearing a face mask during work hours," because "[r]equiring all day wear of a mask can cause restricted respiratory effort," exacerbate his COPD, and increase his fatigue. (Dkt. #47-7, at 4-5.) As with every medical accommodation request submitted to DOR, HR Specialist Simonson was tasked with gathering enough information from the medical provider to understand how to accommodate the employee as required by their medical condition, while maintaining the employee's current working status. In 2021, Simonson received numerous accommodation requests asking for exemptions to the masking policy, and she sought additional medical information for most (if not all) of these requests.

Thus, on September 8, Simonson sent a medical inquiry form to Nurse Practitioner Bourdeaux, listing nine safety measures that all state agencies had implemented in response to COVID-19 and seeking additional information about McKay's medical needs in relation to wearing a mask in the office. The same day, Bourdeaux faxed Simonson back a completed form, which included the following questions in bold and her responses in italics:

> **In your medical opinion can Michael wear a mask and how long can he wear a mask at one time?**
> *No, no more than 30 min (letter requests exemption) due to exacerbation of COPD when all day mask wearing.*
>
> **Will frequent breaks be beneficial while wearing a mask in the office?**
> *Yes but preference is exemption as stated in letter due to exacerbation of COPD when mask wearing.*
>
> **If we can provide an alternative workspace for Michael where they can close the door and take off their mask while**

**they work would you recommend this?**
*Yes*

**Would Michael benefit from wearing a face shield instead of a face mask?**
*If exemption is not considered a face shield is preferred over a mask or alternate work space with no mask and no shield.*

(Dkt. #47-8, at 3-4 (emphasis added).)

HR Specialist Simonson understood Bourdeaux to be saying that McKay could not wear a mask all day because it would exacerbate his COPD, and even though Bourdeaux *preferred* that McKay be exempt from masking, he could wear a mask in intervals of 30 minutes or less without a health consequence.  (Simonson depo. (dkt. #55) at 30-31.)  Therefore, on September 9, 2021, Simonson emailed McKay that his request not to wear a mask in the office or to work from home was denied, but further stated that based on what his doctor had stated, DOR would accommodate his medical needs with the following:  a face shield should he want one; allowing him to work in a conference room where he could close the door and remove his mask; and permitting him to remove his mask while eating, drinking, and using the phone.  In response to McKay's question about how she determined that he could wear a mask for up to 30 minutes at a time, Simonson wrote on September 13, that the 30-minute determination had come from his doctor's responses.  McKay did not contact Simonson again regarding his medical accommodation or seek to modify it in any way, neither did he provide any additional medical information nor tell Bourdeaux that he disagreed with her assessment about his ability to wear a mask for up to 30 minutes without consequences.

### B.  Religious Grounds

On September 2, 2021, McKay had separately emailed HR Specialist Simonson that he would also be filing a religious accommodation request to be exempt from the COVID-19

vaccine, testing, and masking requirements. McKay also asked Simonson what criteria she would use to evaluate this request. Simonson responded that same day, listing a few questions that McKay needed to answer related to the nature of his religious beliefs and how his religious practice conflicted with DOR's masking requirement.

The very next day, on September 3, McKay emailed Simonson to explain his faith and how it prevented him from wearing a mask, testing, and getting a vaccination. Specifically, he wrote that he is a Christian who relies on the Bible in making important life decisions, further citing a Bible verse that he believed supported not being allowed to "[p]ut any type of mask, shield or covering over my face, as I am made in the image of God and I am to stand before Him with my face unveiled (2 Cor 3:18)." (Email chain (dkt. #47-10) at 3.)

On September 7, McKay next emailed Simonson, Kittle, and Diversity Officer Zilliox, asking for an update on his religious accommodation request because he was scheduled to return to the office the following day and wanted to be sure that his religious accommodation would be recognized. Failing that, McKay asked to continue to work from home. Simonson responded the same day, reminding McKay that the accommodation process was "interactive" and requesting additional information for his religious accommodation request, including a letter from his clergy with contact information and guidance on why wearing a mask was considered against his religion. At the same time, Simonson reminded McKay that he could also advance review of his medical accommodation request by having his doctor provide medical information regarding his needs. Within an hour of Simonson's request for a clergy letter, McKay provided her with a form letter from "Pastor David Hall of the True Hope Ministry" with fillable spaces for McKay's name and the date. (Dkt. #47-6, at 3-8.)

14

Still, on September 7, Simonson further emailed McKay that his request for a religious exemption to the masking requirement was denied.  Simonson explained that the denial of McKay's request (and a handful of other employees' requests) was based on the fact that she was able to find the same formatted letter online.  Simonson claims that she would consider an employee's religious accommodation request in more detail if it were accompanied by a personal letter describing how the employee's religion did not allow masking, but she did not believe that McKay's personal statement adequately answered the questions listed in her previous email, including: what sincerely-held religious belief justifies the accommodation; and when she asked for additional information, why McKay responded by providing a form letter. In addition, Simonson chose not to call Pastor Hall to follow up, as his form letter suggested.

On September 27, 2021, McKay emailed his appeal to Simonson and Diversity Officer Zilliox, explaining that:

> The Church, as it is explained in the Bible, is not a building. The Church is the collective of all the believers throughout the world. Modern technology has enabled worshipers to connect nationally and globally. Although I have a local Church that I attend at times, I also have an array of Pastors/Church's that I attend online. Pastor Hall, who provided the signed declaration of faith, is one example.
>
> . . . . After praying for wisdom and discernment regarding God's will pertaining to all of these covid matters I've been inundated with messages pointing to the same conclusion. Which is that God does not want me to cover my face, allow tests, or be vaccinated.

(Dkt. #58-2.)   Zilliox responded that she had worked with Simonson on McKay's accommodation request and agreed with the decision to deny it.  Thus, she explained that if he wished to appeal that decision, the next step would be filing an appeal with the Secretary Barca, which McKay instructed her to do.  A month later, on October 26, 2021, Barca emailed

McKay that his request to not wear a mask had been partially granted by allowing him to work in a conference room unmasked, but no further accommodation would be considered at that time because DOR believed that masking requirements were necessary to keep all employees and visitors safe during the pandemic.

### C. Accommodation Implementation

On September 10, 2021, Supervisor Kittle sent McKay an email outlining two options to move forward with the accommodation of working unmasked in a conference room: (1) DOR was able to coordinate a plan to allow him to telecommute 50% and work from the office 50%; and (2) Kittle and Section Chief Dambach were able to extend his telecommuting hours from one day per week to two and a half days per week, based on IS&E's requirement that all staff must be in the office 50% of the time.[9]  Around this time, IS&E employees were using two conference rooms as accommodation spaces, but those rooms did not have additional monitors for McKay to use in conjunction with his laptop.  However, after McKay had a conversation with Dambach on September 10, she worked with IT to ensure that the conference rooms had two monitors, and McKay did not speak with her again about any missing equipment or other issues related to his use of a conference room as an accommodation.

This accommodation went into effect on September 13, 2021.  As his direct supervisor, Kittle knew that: McKay was not happy working out of a conference room; he had ongoing complaints about the equipment; and performance issues had arisen.  However, she did not know if those issues were specifically because of McKay having to work out of the conference

---

[9] At that time, IS&E employees had varying schedules, including some employees working in the office half-time and others working in the office full-time.  The schedules were set to meet the IS&E requirement that 50% of the staff would work in the office until 4:30 p.m. each workday.

rooms.  Moreover, because Kittle did not handle technology issues, she referred McKay to the IT department.  In addition, Kittle emailed McKay on September 29, addressing his work schedule and brainstorming ways to assist him with these changes.  She also mentioned that: it might be possible to increase his ability to telecommute; and DOR could consider how to adjust his schedule if he was interested.  At some point, McKay was allowed to take over the task of reserving a conference room to work in, which allowed him to choose the room he preferred.  Regardless, McKay admits he never talked to anyone about his issues with the conference rooms except his immediate supervisor, Kittle, and the help desk.

## V.  September 1, 2021 Incident

On September 1, 2021, while his disability accommodation request was still pending, McKay went to work at the office without wearing a mask.  Supervisor Kittle then walked over to McKay's cubicle to inform him that he needed to comply with the masking requirement and to ask him to put on a mask.  McKay refused, telling Kittle that he was unwilling to speak in person and asking that she put anything she wanted to say in writing.  After Kittle informed Section Chief Dambach of all of this, she too walked to McKay's cubicle, then asked him to join Kittle and her in the conference room to discuss the situation.  McKay initially refused, stating that he wanted everything to be in writing, but he complied when Dambach ordered him to do so.

During that conference, which McKay recorded on his phone, Dambach told McKay that because he was unwilling to comply with the DOR masking directive, he was "unfit for

17

duty,"[10] could no longer work either in the office or from home that day, and would need to take paid leave if available. While Kittle was by then aware that McKay had initiated a medical accommodation request, she had not yet informed Dambach of that fact. In fact, Dambach was not aware that McKay had any disability related to the COVID-19 safety guidelines before initiating the conference with McKay, and she also did not know about his medical accommodation request until McKay told her during the meeting in the conference room. Indeed, neither Kittle nor Dambach were involved in McKay's accommodation process, review, or decision-making.

While the parties dispute whether McKay was agitated during the conversation or blocked the door to the conference room, it is undisputed that he was unwilling to comply with the masking directive and seemed resistant to leaving the office until Dambach threatened to contact the Capitol Police. For her part, Kittle thought that everyone was respectful and appropriate during the meeting, even though emotions were high. Later that morning, Dambach sent McKay a follow-up email documenting their conversation.

## VI. Work Rule Investigation About Recording

While Dambach and Kittle knew that McKay had recorded their conversation on September 1, neither recalled Dambach giving McKay permission to do so, which could be considered a serious work violation due to privacy issues and the confidential nature of DOR's work. Therefore, Dambach contacted ER Specialist Dries for guidance after he left the conference room. On September 7, Dries informed Kittle and Dambach that McKay's

---

[10] HR had advised DOR staff to use this phrase for COVID-19 policy violations because the Fitness for Duty Certification form was DOR's framework for determining when an employee could return to work.

recording of the September 1 conference room conversation was likely a work rule violation and instructed them to begin an investigation into this possible violation.

On September 10, Kittle sent McKay an investigatory notice asking him to appear for an interview on September 14, regarding his possible violation of Work Rule #11, prohibiting unauthorized audio and video recording on state property. According to Kittle, she did not know that McKay had also filed a "Respectful Workplace" complaint that same day, which is discussed separately below.

On September 13, McKay responded to Kittle's investigatory notice, stating that he had legal counsel who would appear with him the next day. After McKay's attorney sent Kittle legal filings, including an injunction, on September 15, Kittle forwarded those requests to her supervisors and a DOR attorney. Section Chief Dambach claims that she only became aware that McKay had filed a formal complaint against her after reviewing his legal filings around September 15. However, McKay claims that "management and HR [] all shared information," and he specifically gave Kittle permission "to share the information." (Dkt. #59, at ¶ 49.) Regardless, on September 16, Kittle and a DOR attorney conducted the investigatory interview with McKay and his legal counsel, during which McKay explained that Dambach had given him approval to record the conversation, which his video of the conversation would confirm. On September 17, DOR legal counsel further advised Kittle that the video sent by McKay's attorney confirmed that Dambach stated "That's fine" after being informed that McKay was recording the September 1 meeting. This prompted legal counsel to instruct Kittle to close the investigation because there was no work rule violation. On September 20, IS&E Division Administrator Hardt emailed McKay to confirm that *no* discipline would be issued.

19

## VII.  McKay's Respectful Workplace Complaint

After requesting the appropriate form from Diversity Officer Zilliox on September 7, McKay filed his "Respectful Workplace" complaint[11] on September 10, challenging Dambach's behavior on September 1, both outside his cubicle and in the conference room.  Specifically, McKay complained that Dambach did not care about his disability, told him he was unfit, and threatened to call the Capitol Police if he did not leave.  Zilliox was responsible for processing McKay's complaint, and neither Kittle nor Simonson had any role in that process, despite Simonson working under Zillox's supervision.  While McKay did not speak with Kittle, Dambach, or Barca about his workplace complaint (or send them a copy of it), he now speculates that Kittle and Dambach knew that he had filed the complaint based on his general belief that "management and HR [] all shared information," and he had given Kittle permission "to share the information."  (Dkt. #59, at ¶ 49.)  However, on September 15, Dambach contemporaneously emailed HR staff and her supervisors indicating that she had just learned about the complaint against her and asking what she needed to do, if anything.

During an interview about the complaint with Zilliox on October 11, McKay claimed that Dambach was aggressive and loud and accused him of being "unfit."  Zilliox's notes from that interview state that she had not yet reviewed McKay's September 1 video because it had not been sent to her, nor did she know whether it had been shared with HR, but she intended to obtain a copy.  (Dkt. #48-7, at 1.)  Apparently, Zilliox had not interviewed either Dambach or Kittle during her investigation.

---

[11] DOR's "Respectful Workplace Policy and Complaint" process is governed by Chapter 440 of the Wisconsin Human Resources Handbook, which states that an employee should complete a DOA-15812 form and submit it electronically to any member of management, the EI Officer/designee, or HR Manager.

20

Nonetheless, in a "disposition letter" dated October 27, 2021, Zilliox wrote that after reviewing the video and other information provided, she found McKay's claims of discrimination, harassment, hostile work environment, and bullying to be "unsubstantiated" and closed the investigation of his complaint. In reference to the video and McKay's complaint that Dambach had ignored his medical and religious accommodation requests on September 1, Zilliox noted in particular that, while accommodation requests are initiated and processed through HR Specialist Simonson, she could not approve any accommodation until all documentation had been obtained. Zilliox also noted that McKay's medical accommodation was approved on September 9, while his religious accommodation had been denied before that date.

## VIII. Additional DOR Actions

### A. McKay's Unexcused Absences

On September 13, 2021, Supervisor Kittle also informed HR about McKay calling in sick that day, which put him at 48 hours of unscheduled leave hours used within a 6-month period, prompting her to ask HR how she should proceed. HR advised Kittle to follow up with McKay, set forth expectations, ask him to provide a doctor's note, and clarify the consequences of not doing so under DOR's attendance policy set forth at HR70 and limiting the number of hours an employee may be absent unscheduled within a certain time period. Then, still on September 13, Kittle emailed McKay to advise him that he had reached the limit of unscheduled absences within a six-month period and ask him to provide a doctor's note or

other medical documentation for any of the unscheduled absences by September 16.[12]

Although McKay failed to provide a doctor's note or other documentation regarding his unexcused absences, after discussing the issue with HR, DOR decided to excuse all three of McKay's absences while his accommodation requests were pending.  Kittle then advised McKay that he was no longer at the absence limit per policy, and no disciplinary action was taken against him for unexcused absences.

### B.  Weekly COVID Testing

As of October 18, 2021, state employees were all required to either submit weekly COVID-19 testing information or submit their positive vaccination status.  Each week, beginning on November 15, HR Director Copus sent to IS&E Division Administrator Hardt a list of employees who were not complying with the required, weekly testing and were subject to investigation.  While Hardt instructed Section Chief Dambach to hand out letters to employees who were failing to follow the COVID-19 testing requirements, Supervisor Kittle was not aware of any individual employee's COVID-19 testing compliance or reporting.  These failure-to-comply letters informed employees that they would be going on unpaid administrative leave for failing to follow COVID-19 testing requirements, which would cause them to be deemed unfit for duty.

On November 17, Dambach, Audit Bureau Director Wendy Miller, and Kittle handed a failure-to-comply letter to McKay but also told him that they had recently become aware of

---

[12] Kittle represents that: she regularly reviewed the attendance and unexcused absence policies with her team, including them in almost every recap she sent; and other employees, including Kittle herself, previously had similar attendance issues, and asking for medical documentation to support unscheduled absences was a very common practice.  In response, McKay attempts to dispute this proposed factual finding by stating that it was not standard practice to require a doctor's note, but he has not supported his contention with a citation to his affidavit or any other admissible evidence.

confusion with the reporting process, making it possible that DOR did not have correct information about an employee's COVID-testing compliance. For his part, McKay stated that he *was* compliant with the testing requirement, but had not added this information to the personnel system, STAR. Regardless, shortly thereafter, Section Chief Dambach and her supervisors told McKay that the consequences described in the letter were "postponed" based on the assumption that his COVID-19 testing results would be added to DOR records.

On November 17, McKay emailed Copus, Hardt, and his attorney to inform them about his visit from Kittle, Dambach, and Miller. McKay stated that he had been testing, but had not been aware of or completed the additional STAR-reporting step, which he would now complete. The next day, Section Chief Dambach and other staff received a letter via email confirming that McKay was not being placed on administrative leave, and Kittle delivered this letter to McKay as well.

## IX. McKay Resigns

In December 2021, McKay emailed Kittle as his direct supervisor to request vacation leave from January 10 through January 28, 2022. Kittle responded that so long as he had annual leave available to use, he could take the time off.[13] Then on January 31, 2022, while he was still on leave, McKay informed Kittle that he was resigning from the State effective February 11, 2022, and taking sick leave for two days. On February 7, Kittle delivered a letter acknowledging McKay's resignation, and Copus and McKay came to an agreement that his last

---

[13] While McKay initially alleged that he was denied vacation time that Kittle had approved, and the parties have proposed additional factual findings regarding McKay's leave status around this time, McKay appears to have abandoned this argument as he fails to raise or discuss it in responding to defendants' motion for summary judgment.

day in pay status would be February 11.  According to McKay, DOR offered to accept February 11 as his last day of work if he signed a document absolving DOR of any discriminatory behavior, which he declined to do.

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then to survive summary judgment the non-moving party must provide evidence "on which the jury could reasonably find" in their favor.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.

Plaintiff McKay contends that a reasonable jury could find on the present record that: (1) defendant DOR failed to accommodate his COPD under the ADA and his sincerely-held religious beliefs under Title VII; (2) DOR engaged in harassment that created a hostile work environment and led to his constructive discharge, and retaliated against him based on his disability and religion, in violation of Title VII and the ADA; and (3) individual defendants Barca, Kittle, Dambach, and Simonson imposed a substantial burden on his religious practice in violation of the Free Exercise Clause of the First Amendment.  In contrast, defendants contend that McKay has failed to present sufficient evidence from which a reasonable jury could find in his favor as to any of his claims, and alternatively argues with respect to his First Amendment claim that the individual defendants are entitled to qualified immunity.

## I. Title VII and ADA

### A. Reasonable Accommodation

#### 1. Disability Grounds

The ADA, 42 U.S.C. § 12112(a), makes it unlawful for an employer to discriminate on the basis of a disability against a "qualified individual," defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires," 42 U.S.C. § 12111(8).  To prove a failure to accommodate claim under the ADA, a claimant must at least establish a prima facie case that the employee was a qualified individual with a disability *and* the employer was aware of the disability but failed to reasonably accommodate it.  *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019); 42 U.S.C. § 12112(b)(5)(A); *see also Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017) ("The ADA is an antidiscrimination statute, not a medical-leave entitlement," and a reasonable accommodation "is expressly limited to those measures that will enable the employee to work.").  If the employee establishes the elements of a prima facie case, the burden shifts to the employer to prove that the requested accommodation would impose an undue hardship.  *Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 850 (7th Cir. 2019).  While defendants neither dispute for the purpose of summary judgment that plaintiff is a qualified individual with a disability due to his COPD, nor that DOR was aware of his disability, they contend that DOR implemented a reasonable accommodation in accordance with his doctor's recommendations.[14]

---

[14] Because the court agrees with defendants that plaintiff has failed to establish that DOR's accommodation was unreasonable, it does not address the parties' arguments about whether an alternative accommodation of working from home full-time would have posed an undue burden on DOR.  Even so, the court addresses the issue of undue burden below in conjunction with DOR's denial of plaintiff's request for a separate, religious accommodation.

The reasonable accommodation process under the ADA begins with the employee, who has the initial duty to inform the employer of any disability. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178 (7th Cir. 2013), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Here, it is undisputed that plaintiff informed DOR that he had COPD, which prevented his breathing adequately while wearing a mask, as he became light-headed and sick to his stomach, even walking between his desk and the office printer. Plaintiff further advised that prolonged masking gave him headaches and blurred vision, making him light-headed and sick to his stomach. Contrary to plaintiff's suggestion, however, the actual accommodation process did not begin until he submitted the letter from Nurse Practitioner Bourdeaux on September 8, 2021. *See id.* (finding same); *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009) ("[O]ur cases have consistently held that disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor" before an employer is required to provide an accommodation).

While plaintiff asked that he be accommodated with an exemption from the mask requirement or full-time work from home, neither the ADA nor DOR's reasonable accommodation policy required it to provide plaintiff with the exact accommodation he requested. *Cloe*, 712 F.3d at 1178. Rather, "[i]dentifying reasonable accommodations for a disabled employee requires both [the] employer and employee to engage in a flexible, interactive process," for which "both parties are responsible." *Brown v. Milwaukee Bd. of Sch. Directors*, 855 F.3d 818, 821 (7th Cir. 2017) (citing *Stern v. St. Anthony's Health Center*, 788 F.3d 276, 292 (7th Cir. 2015), and *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 963 (7th Cir. 2014)). To this end, "if the employee 'does not provide sufficient information

to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the disabled employee.'" *Id*. (quoting *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 702 (7th Cir. 2014)).  Similarly, the employer's "duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort."  *Cloe*, 712 F.3d at 1176.

Plaintiff stated in his initial reasonable accommodation request form that he could not wear a mask for even a short period of time without suffering difficulties breathing and other physical symptoms.  However, upon HR Specialist Simonson's reasonable request, plaintiff later provided a letter from his health care provider Bourdeaux, who opined that he should be exempt from the masking requirement because wearing a mask *all day* could restrict his respiratory effort and exacerbate his COPD and fatigue.  As part of the interactive process to arrive at a reasonable accommodation, Simonson immediately sent Bourdeaux a medical inquiry form, which listed the State's COVID-19 safety measures and asked about plaintiff's specific medical needs in relation to wearing a mask in the office, including whether he could work in a closed conference room without a mask or wear a mask for *any period* of time. Bourdeaux responded the same day that while she would prefer plaintiff be deemed exempt from ever wearing a mask, he was medically able to wear a mask for up to 30 minutes at a time and could work in an alternative workspace without a mask.  Based on that medical opinion, Simonson told McKay the following day that DOR would accommodate his medical needs by allowing him to work in a conference room, where he could close the door and remove his mask, and would only require him to wear a mask when traversing through or visiting common areas of the office.  In addition, plaintiff's immediate supervisor, Kittle, was able to arrange

plaintiff's schedule so that he could work at home half-time, meaning he would only need to work in the office a total of two and a half days per week.

In response, plaintiff argues that DOR disregarded his comfort, purposely providing him with the minimum accommodation possible. He further argues that the partial accommodation he received was unreasonable and made him miserable because he had to wear a mask multiple times a day while at the office, causing him light-headedness, an upset stomach, headaches, and blurred vision, just as plaintiff told Simonson would happen in his initial accommodation request form. However, it is undisputed that McKay did not inform either DOR or his medical provider that the accommodation received was insufficient, much less unreasonable, as was his responsibility under the interactive process that the ADA requires of both employees and employers. *See Cloe*, 712 F.3d at 1178 (internal citation omitted) ("If [the interactive] process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown."). More specifically, it is undisputed that plaintiff did not contact Simonson again regarding his medical accommodation or seek to modify it in any way; nor did he provide any additional medical information or tell Bourdeaux that he disagreed with her assessment about his being able to wear a mask for up to 30 minutes.

Plaintiff further argues that his physical discomfort should have been obvious to his employer because he had already told Simonson in his initial request form that he would experience physical symptoms anytime he wore a mask, pointing out that Simonson testified in her deposition that she found "everything in Mr. McKay's initial request form was truthful." (Simonson depo., dkt. #55, at 9.) However, Simonson was not testifying about the individual statements plaintiff made in the request form, and otherwise made clear in her testimony that

28

he did not receive the exact accommodation he requested because it was not supported by the medical evidence he had submitted. (Dkt. #55, at 8-9, 18-19.)

Accordingly, a jury could not reasonably conclude from Simonson's vague testimony about plaintiff's request form being truthful rendered her reliance on his own corroborating medical evidence unreasonable, even if it varied from plaintiff's initial, subjective complaints, especially when plaintiff failed to revisit the matter with either HR Specialist Simonson or his medical provider, Bourdeaux or provide further medical documentation that wearing a mask even if just for a short period would cause him harm.[15]

In a final undeveloped argument, plaintiff contends that the accommodation he received was not reasonable because it did not allow him to do his work, as he was not provided with appropriate computer equipment and his productivity suffered. However, "[a] 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position.'" *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (citing 42 U.S.C. § 12111(8)). Here, plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude that he needed his cubicle to perform the essential functions of his job, let alone that DOR knew that its seemingly reasonable accommodation -- having him work unmasked in a conference room during the height of a global pandemic -- would be insufficient. *See Cloe*, 712 F.3d at 1177-79 (employer's five-month

---

[15] Even now, plaintiff has not disclosed a medical expert to counter his own medical provider's opinion that he could wear a mask up to 30 minutes at a time. *See Romzek v. Baldwin Area Med. Ctr., Inc.*, No. 23-CV-27, 2024 WL 4215728, at *8 (W.D. Wis. Sept. 17, 2024) (finding plaintiff's assertion that wearing a mask 100% of the time was potentially dangerous to his health fell within "specialized knowledge" governed by Fed. R. Evid. 702, which requires qualified experts to render such opinions based on reliable facts and principles). Moreover, while plaintiff also criticizes Simonson for not considering that he was more likely to contract COVID-19 by working unmasked part of the time, he also chose not to wear a mask in the office on at least a few occasions, including on September 1, 2021, and even requested an accommodation not to wear one at all.

delay in assigning plaintiff with mobility issues a specific, nearby parking spot was reasonable because employer "had no way of knowing that its other seemingly reasonable accommodations . . . would be insufficient" and "acted with reasonable speed" to offer new accommodations when it found out that they were).  In fact, it is undisputed that when plaintiff informed Supervisor Kittle that he was having "technology issues" in the two conference rooms provided,[16] Kittle referred him to the IT department, brainstormed ways to assist his recollection of which conference room he would be using, and offered to investigate increasing his ability to telecommute.  Moreover, it is undisputed that plaintiff only talked to Kittle and the help desk about these undefined technology issues or any other issue he had with the conference rooms in an attempt to modify or renegotiate his accommodation.  Based on the record before the court, therefore, a reasonable jury could neither conclude that DOR's accommodation of McKay's disability was unreasonable nor that DOR should have known that the accommodations provided would be or were insufficient, especially because they exactly tracked the limitations noted by plaintiff's medical provider and plaintiff never sought to modify the accommodation after it was implemented.

### 2. Religious Grounds

Under Title VII, "[a]n employee claiming that [his] employer failed to accommodate [his] religion must as a threshold matter show that (1) the observance, practice, or belief conflicting with an employment requirement is religious in nature; (2) the employee called the religious observance, practice, or belief to the employer's attention; and (3) the religious

---

[16] While the allegations in McKay's amended complaint discussed in more detail the problems he had with the conference rooms, he has failed to propose any factual findings or present any admissible evidence in support of those allegations in his response to defendants' motion for summary judgment.

30

observance, practice, or belief was the basis for the employee's discriminatory treatment." *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1009 (7th Cir. 2024) (citing *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013)).  A belief is religious if it is: (1) "religious in the person's own scheme of things" and (2) sincerely held.  *Adeyeye*, 721 F.3d at 448.  Once an employee meets this burden, the employer can still invoke the affirmative defense that the requested accommodation "would result in 'undue hardship' or 'substantial' burden in the 'overall context' of the business."  *Passarella*, 108 F.4th at 1009 (citing *Groff v. DeJoy*, 600 U.S. 447, 468 (2023)).

Here, it is undisputed that plaintiff told DOR that putting any type of mask or shield over his face, even for a short-period of time, would violate his religious belief that he is "made in the image of God" and must "stand before Him with [his] face unveiled."  (Dkt. #47-10, at 3.)  While defendants concede for the purposes of summary judgment that plaintiff called his beliefs and practice to DOR's attention and that DOR based its denial of his requested accommodation at least in part on an assessment of those beliefs and practice, they also contend that: (a) they granted plaintiff a reasonable, alternative accommodation by requiring him to wear a mask for a limited time; (b) his request for a *complete* exemption from the masking requirement was neither religious nor sincere; and (c) granting either of plaintiff's requested absolute accommodations posed an undue hardship.  For the reasons discussed below, the court finds that plaintiff has presented sufficient evidence in the record from which a reasonable jury might find in his favor as to all three issues.

### a.  Reasonable alternative accommodation

A reasonable accommodation is one that "eliminates the conflict between employment requirements and religious practices."  *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986);

*see also Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993) (citing same).  While "[t]he reasonable accommodation requirement is meant to 'assure the individual additional opportunity to observe religious practices, [it does] not impose a duty on the employer to accommodate at all costs.'" *Smith v. Concentra, Inc.*, 240 F. Supp. 3d 778, 784 (N.D. Ill. 2017) (citing *Philbrook*, 479 U.S. at 70).  As with disability accommodations, therefore, a reasonable religious accommodation "need not be an employee's *preferred* accommodation or the *most* beneficial accommodation for the employee; once the employer offers an alternative that reasonably accommodates the employee's religious needs the statutory inquiry is at an end." *Id*. at 784-85 (emphasis added); *see also EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1997) (finding same); *Romzek v. Baldwin Area Med. Ctr., Inc.*, No. 23-cv-27, 2024 WL 4215728, at *7 (W.D. Wis. Sept. 17, 2024) (same).  However, unlike with his request for the same accommodation on disability grounds, requiring plaintiff to wear a mask or face shield in the office common areas, even for a short period of time, would not necessarily eliminate the claimed conflict with his stated religious beliefs and practice, since he claims that wearing a mask for *any* period would violate his religion.  Therefore, on this record, a reasonable jury could conclude that defendants' proposed alternative accommodation was not reasonable.

### b.  Sincerity of Plaintiff's beliefs

Next, defendants argue that plaintiff has failed to show that he "sincerely held" a religious belief conflicting with DOR's masking requirement based only on vague statements about not covering his face, at least without tying them to any particular religious belief or practice.  Indeed, defendants appear to argue that a reasonable jury would be compelled to find on this record that plaintiff took actions revealing the *in*sincerity of his request, including: wearing a mask in the office just to get along; asking for a religious accommodation only three

32

days after he asked for the exact same accommodation on disability grounds; seeking an accommodation that was highly convenient for him, as he had an hour commute to work; and obtaining a form letter from a pastor he barely knew to corroborate his requested religious accommodation. As defendants concede, however, plaintiff does not forfeit his religious rights merely because he failed to achieve perfect compliance with his religious practices, *Grayson v. Schuler*, 666 F.3d 450, 454-55 (7th Cir. 2012); and credibility is typically a matter to be decided by the jury at the end of trial. While the nature and timing of plaintiff's requested accommodation may seem suspicious to some, therefore, after weighing all of the evidence at trial, a reasonable jury could find that he sincerely held a religious belief requiring him not to place a mask on his face.

### c. Undue hardship

Finally, defendants have failed to present convincing evidence compelling a reasonable jury to find that an alternative accommodation of working 100% from home would have unquestionably posed an undue hardship to DOR.[17] For example, while defendant Dambach maintained that in-person office work fosters collaboration, which is important to employee development and training, as well as helps protect confidential information, it is undisputed that half of all DOR employees continued to work from home at least part-time after employees were called back to the office in July 2021, and some number of employees were allowed to

---

[17] Plaintiff does not dispute that working in the office without a mask would have posed a significant safety risk to both his health and the health of other employees working in the office during 2021, when the highly-infectious and potentially-dangerous Delta variant was active. Indeed, as this court and other federal courts have now recognized, "requiring that people wear masks is a rational way" to curb the spread of COVID-19. *Joseph v. Becerra*, No. 22-cv-40-wmc, 2022 WL 17262231, at *4 (W.D. Wis. Nov. 29, 2022) (citing *Mahwikizi v. Centers for Disease Control & Prevention*, 573 F. Supp. 3d 1245, 1254 (N.D. Ill. 2021), and collecting other cases).

work from home full-time for medical reasons, including one other individual on plaintiff's floor. Moreover, defendants have failed to present evidence from which a reasonable jury would have to find that: plaintiff's job duties *required* him to be present in the office at least part-time; or allowing him to work from home full-time would have posed a financial cost or resulted in a measurable, negative effect on employee development, collaboration, or confidentiality. If anything, the evidence provided to the court is to the contrary based on the undisputed facts that: employee productivity and confidentiality overall *did not* suffer while employees all worked from home; and plaintiff in particular remained productive and able to meet and collaborate with staff over Zoom during this period as well. Because a reasonable jury could conclude from the evidence of record to date that DOR failed to meet its duty to propose a reasonable accommodation of plaintiff's sincerely-held religious beliefs, defendants are not entitled to summary judgment in their favor on his Title VII reasonable accommodation claim.

### B. Hostile Work Environment and Constructive Discharge

To prove a hostile work environment based on harassment under Title VII and the ADA, plaintiff must show that: (1) he was subject to unwelcome harassment; (2) the harassment was based on his religion or disability; (3) the harassment was severe or pervasive so as to alter the conditions of his employment and create a hostile or abusive working environment; and (4) there is basis for employer liability. *See Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 977 (7th Cir. 2021) (elements of hostile work environment claim are the same under Title VII and ADA); *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833-34 (7th Cir. 2015) (citing *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) for specific elements). "To rise to the level of a hostile work

34

environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an *abusive* relationship."[18]  *Huri*, 804 F.3d at 834 (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)) (emphasis in original).  Still, constructive discharge entails something "even more egregious than the high standard for hostile work environment claims."  *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 628 (7th Cir. 2019) (internal quotation omitted).  "A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004).

Here, plaintiff contends that once he requested religious and disability accommodations, defendants made his work environment so intolerable that he felt forced out and had to resign.  In support, he cites the following, adverse actions:

- He was forced to go to the office where he would be exposed to COVID-19.

- He had to wear a mask that made him physically ill and violated his religious principles.

- Defendants failed to provide him a proper room and work equipment.

- Defendants regularly investigated him and made allegations against him.[19]

---

[18] While both parties cite the lower standard of "some harm" announced in *Muldrow v. City of St. Louis*, 601 U.S. 346, 350, 357-58 (2024), for claims involving "discrete acts" of discrimination (such as job transfers or delayed training), the Seventh Circuit has not applied *Muldrow* to claims of hostile work environment, constructive discharge, or retaliation.  *See, e.g., Bowman v. City of Chicago Bd. of Educ.*, No. 24-2938, 2025 WL 2759539, at *3 (7th Cir. Sept. 29, 2025) (applying pre-*Muldrow* standard and finding plaintiff "cannot establish a Title VII harassment claim because he did not endure conduct that was severe or pervasive"); *Est. of Harris v. City of Milwaukee*, 141 F.4th 858, 869 (7th Cir. 2025) (declining to extend *Muldrow* to Title VII retaliation claim).

[19] Plaintiff fails to identify what specific investigations and allegations constituted harassment, but the court assumes he is referring to: Dambach's statements during their September 1, 2021 meeting; the resulting investigation into his possible workplace violation for recording that meeting; Kittle's directive to provide a doctor's note for his unscheduled absences; and his receipt of a letter stating he was not in compliance with DOR's COVID-testing policy.

(Dkt. #61, at 52-53.)  While plaintiff concedes that he was never disciplined in any way for poor performance or a work rule violation, he nevertheless contends considering the "totality of the circumstances," his employer "unreasonably interfered" with his work performance to the extent that "[a] reasonable person in [his] position would have felt that 'the writing was on the wall' in terms of his no longer being welcome at DOR." *Id.* at 53.

As defendants argue, the above conduct cited by plaintiff cannot even be considered adverse, much less severe, pervasive, or abusive.  Indeed, the three initial examples of adverse conduct relate to DOR's denial of his requested accommodation on disability and religious grounds, and plaintiff offers no persuasive examples of the fourth.  Moreover, as discussed above, DOR engaged in the interactive accommodation process and offered plaintiff a reasonable accommodation for his disability, as well as what a reasonable jury weighing the evidence as a whole at trial might find was a reasonable accommodation of his religious beliefs and practice. *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 961 (7th Cir. 2021) ("[I]t is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests.").

While DOR required plaintiff to come to the office two and a half days a week, work in a conference room with technology challenges, and wear a mask for short periods of time when present in common areas of the office, it is also undisputed that DOR was requiring *all* employees at that time to wear a mask in the office as a temporary measure to minimize the risks and dangers posed by a global pandemic.  Further, plaintiff has failed to present any evidence from which a reasonable jury could find that his experience working in a conference room and wearing a mask in common areas rose to harassment, much less the egregious level as to support a claim of hostile work environment or constructive discharge, instead of its

36

legitimate interest in keeping its workers safe and productive during the pandemic. *See Rongere v. City of Rockford*, 99 F.4th 1095, 1105 (7th Cir. 2024) (finding plaintiff's complaints "about overwork rather than about a place permeated with intimidation, ridicule, and insult" were "frustrations" that did not support a hostile work environment claim); *Golat v. Wisconsin State Ct. Sys.*, No. 23-cv-719, 2025 WL 3063632, at *6 (W.D. Wis. Nov. 3, 2025) ("A connection between the harassment and the plaintiff's protected class need not be explicit, but there must be some connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a [protected class].") (internal citations and quotations omitted).

Plaintiff also refers to "false accusations" that he failed to adhere to workplace policies prohibiting the recording of conversations, requiring reports of COVID-testing, and seeking doctor's notes for unscheduled absences. However, the undisputed facts establish that all three accusations involved understandable, if mistaken, assumptions which were then quickly dropped without penalizing plaintiff in any way. While defendants concede in their supporting brief that Dambach was agitated and insistent that plaintiff had to leave the office for the day because he was "unfit" for work unless wearing a mask in the office, this one-time admonishment, even as described by plaintiff, also was not sufficiently adverse, much less severe and pervasive. *See Arnold*, 142 F.4th at 471 (citing with approval *Rios v. Centerra Grp., LLC*, 106 F.4th 101, 112-13 (1st Cir. 2024), which held that even under *Muldrow*, "[a] mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment."). Finally, again, plaintiff has failed to present evidence that DOR based its investigations (or Dambach based her admonishment) on his disability or religion.

Indeed, plaintiff offers *no* evidence that Dambach even knew he had filed requests for accommodations when she made her comments on September 1, 2021.

Accordingly, considering the totality of the evidence of record, a reasonable jury could not find that any of DOR's actions, either individually or together, constituted harassment creating a hostile or abusive working environment.[20]   Therefore, defendants are entitled to summary judgment with respect to McKay's Title VII and ADA claims regarding hostile work environment and constructive discharge.

### C. Retaliation

Both Title VII and the ADA also prohibit employers from retaliating against individuals who have engaged in protected activities, including requesting reasonable accommodations or filing internal complaints. *See Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1118 (7th Cir. 2022) (Title VII); *Rowlands v. United Parcel Serv.-Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (ADA); *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (42 U.S.C. § 12203(a) bars employers from retaliating against employees who assert discrimination under the ADA).   To survive summary judgment on his retaliation claim, plaintiff must offer evidence that allows a reasonable jury to find that:   (1) he engaged in a statutorily-protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *Est. of Harris v. City of Milwaukee*, 141 F.4th 858, 869 (7th Cir. 2025).   As for the first element, defendants concede that plaintiff engaged in statutorily

---

[20] As described above, even under the lower standard for discrete acts of discrimination, plaintiff has not presented evidence that he was left "worse off" with respect to any "identifiable term or condition" of his employment, such as his position, job duties, salary, or benefits. *Muldrow*, 601 U.S. at 354-55; *Dave v. Bd. of Trs. of S. Illinois Univ.*, No. 25-1465, 2026 WL 221251, at *3 (7th Cir. Jan. 28, 2026).

protected activity by requesting a medical accommodation on August 30, 2021, requesting a religious accommodation on September 3, 2021, and filing an internal workplace complaint against Dambach on September 10, 2021. However, defendants argue that plaintiff has not shown that he suffered any adverse employment action, much less retaliation that is "materially adverse, meaning that it causes 'significant' harm" sufficient to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Harris*, 141 F.4th at 869 (citing *Muldrow*, 601 U.S. at 350, 357-58).

Without citing any legal authority or specific factual findings, plaintiff also generally contends that his working conditions "deteriorated" and again that he was subject to investigation and baseless accusations as a result of his protected activities. As discussed above, however, none of those actions that defendants took with respect to plaintiff's accommodation requests and potential work rule violations resulted in any *significant* harm to plaintiff, and certainly did not dissuade him from filing a respectful workplace complaint against Dambach on September 10, 2021, or appealing the denial of his religious accommodation request on September 27, both of which occurred *after* he was denied his requested accommodations, had what he characterizes as a "confrontational" conversation with Dambach on September 1, and was subject to an investigation for recording that conversation. *See Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 912 (7th Cir. 2022) (retaliatory action must "rise above trivial harms, such as petty slights or minor annoyances that often take place at work and that all employees experience"). Without more, a reasonable jury could not conclude that DOR's actions were so significant or materially adverse to dissuade a reasonable employee from engaging in protected activity. *Id*.

39

Even if DOR's actions could be deemed materially adverse, plaintiff has also failed to offer sufficient evidence for a reasonable jury to find that DOR would not have taken its actions but for its retaliatory motive. *See Flowers v. Kia Motors Finance*, 105 F.4th 939, 946-47 (7th Cir. 2024) (while court must draw all reasonable inferences in nonmoving party's favor at summary judgment, inferences supported only by speculation and conjecture will not defeat the motion); *Igasaki*, 988 F.3d at 960 (plaintiff "must provide more than his mere assertions to defeat summary judgment"). At most, plaintiff merely suggests that the timing of DOR's actions is suspicious, having occurred around the time that he requested accommodations and filed his complaint against Dambach. However, standing alone, "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *Harris*, 141 F.4th at 869-70 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). Regardless, as discussed above, DOR had legitimate, non-retaliatory reasons for all of its actions, which absent evidence to the contrary, a reasonable jury would be compelled to find would have occurred even if plaintiff had not asked for an accommodation or filed a respectful workplace complaint. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) (if defendant honestly believed the reasons it gave for allegedly retaliatory action, plaintiff cannot establish pretext, even if defendant's reasons were mistaken, cruel, unethical, or downright irrational). Accordingly, defendants are entitled to summary judgment as to plaintiff's retaliation claims under Title VII and ADA.

## II. Free Exercise of Religion

To prevail on a First Amendment free exercise claim, plaintiff must prove that a defendant "personally and unjustifiably placed a substantial burden on his religious practices."

*See Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016) ("A substantial burden puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."); *see also Joseph*, 2022 WL 17262231, at *4 (government cannot impose substantial burden on central religious belief or practice). Essentially repeating his claims under Title VII, McKay contends that a reasonable jury could find that: (1) defendants Simonson and Barca substantially burdened his religious practice by denying his accommodation request, forcing him to work in the office while wearing a mask in the common areas; and (2) defendants Kittle and Dambach imposed an intolerable work environment on him after his request for a religious accommodation was denied, including failing to provide him with a proper work space and equipment and accusing him of being non-compliant with the COVID-19 testing policy.

As defendants argue, however, plaintiff has failed to show how Kittle's and Dambach's alleged harassment placed a burden on his religious practice of not wearing a mask. To the contrary, the undisputed facts establish that neither of these defendants had any role in determining that plaintiff was not exempt from the masking requirement on religious grounds, and plaintiff has failed to offer any evidence that their alleged, after-the-fact actions regarding his workspace, lack of adequate equipment, and COVID-testing compliance were related to his religious practices.[21] Accordingly, defendants Kittle and Dambach are entitled to summary judgment on McKay's First Amendment claim against them.

Defendants further point out that even if a reasonable jury could conclude that plaintiff's objection to wearing masks is rooted in his religious beliefs, he has also failed to

---

[21] To the extent that plaintiff may be arguing that defendants Kittle and Dambach retaliated against him for asserting his First Amendment rights, he cannot do so now, having failed to assert a First Amendment retaliation claim in his amended complaint (dkt. #51), a fact that was first identified in this court's order denying defendants' earlier motion to dismiss. (*See* dkt. #36.)

41

present sufficient evidence for a reasonable jury to find that Simonson's and Barca's denial of his religious accommodation substantially burdened his religious *practice,* as opposed to his generally-stated belief, or in the alternative, they argue that Simonson and Barca are entitled to qualified immunity as a matter of law. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (qualified immunity shields government officials from liability unless they violate clearly established statutory or constitutional rights). Because qualified immunity is dipositive here, the court addresses that issue without addressing the alleged, underlying constitutional violation. *See Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 654-55 (7th Cir. 2024).

When a public official asserts qualified immunity at the summary judgment stage, the plaintiff has the burden of defeating it by showing that a defendant violated a clearly established statutory or constitutional right that a reasonable person would have known. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *Garcia v. Posewitz*, 79 F.4th 874, 879 (7th Cir. 2023). To be clearly established, a right must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Schimandle*, 114 F.4th at 655. At this step, the United States Supreme Court has frequently cautioned against defining that right at too high a level of generality, so as to render the defense of qualified immunity relatively meaningless. *Mullenix*, 577 U.S. at 12.

Under the above standard, plaintiff has the burden of showing that defendants are not immune by citing controlling legal authority clearly prohibiting employers from denying a request for an exemption from masking requirements on religious grounds, despite the existence of a global pandemic that had already prompted defendants to allow all workers to work from home and later allow plaintiff to work in a private conference room without a mask or face shield of any kind. While plaintiff cites *Fulton v. City of Philadelphia*, 593 U.S. 522, 533

(2021), for its holding that the "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature," that case addressed a state-licensed, Catholic foster care agency's decision refusing to certify same-sex couples as foster parents, which obviously does not begin to address the request for a religious, workplace accommodation under circumstances at all similar on its facts to those in this case.

Finally, contrary to McKay's conclusory argument, the court does not find that defendants' denial of his request to *never* wear a mask on religious grounds was obviously unconstitutional.  Instead, the Supreme Court and many other federal courts have recognized that "[s]temming the spread of COVID-19 is unquestionably a compelling interest," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (per curiam), and "requiring that people wear masks is a rational way to do that," *Joseph*, 2022 WL 17262231, at *4 (citing *Mahwikizi v. Centers for Disease Control & Prevention*, 573 F. Supp. 3d 1245, 1254 (N.D. Ill. 2021), and collecting cases).  Accordingly, McKay has wholly failed to show that the individual defendants' denial of his requested accommodation during a global pandemic was objectively and beyond question a violation of the Free Exercise Clause of the First Amendment, rendering defendants entitled to qualified immunity with respect to that claim.

## ORDER

IT IS ORDERED that:

1) Defendants' motion to amend their answer (dkt. #42) is GRANTED.

2) Defendants' motion for summary judgment (dkt. #43) is GRANTED in part and DENIED in part as follows:

    a. Defendants' motion with respect to plaintiff Michael McKay's Title VII reasonable accommodation claim on religious grounds is DENIED; and

43

b. Defendants' motion is GRANTED in all other respects as to plaintiff's remaining Title VII, ADA, and First Amendment claims, which are DISMISSED.

Entered this 15th day of April, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge